# Illinois Official Reports

## Appellate Court

*In re Natalia O.*, 2019 IL App (2d) 181014

| | |
|---|---|
| Appellate Court Caption | *In re* NATALIA O. and ELENA V., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Anita B., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-18-1014 |
| Filed | April 18, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, Nos. 17-JA-262, 17-JA-263; the Hon. Francis M. Martinez, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Gary D. McGuane, of DeKalb, for appellant.<br><br>Marilyn Hite Ross, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Steven A. Rodgers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Presiding Justice Birkett and Justice Hutchinson concurred in the judgment and opinion. |

**OPINION**

¶ 1      Elena V., the daughter of the respondent, Anita B., reported in October 2016 that Anita's partner, Carlos O., had touched her breasts and genitals. However, in July 2017 Elena told Anita that she had lied earlier and that Carlos had not touched her, and she gave testimony to this effect at the trial of the abuse and neglect petitions filed by the State. The trial court found that the State had proved allegations of abuse or neglect as to two of Anita's three daughters. Anita appeals, asserting that these findings were against the manifest weight of the evidence and that the trial court abused its discretion in admitting certain evidence. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3      We summarize here the evidence presented at the three-day trial, which included not only testimony by witnesses but also statements contained in various documentary exhibits, including the packet (indicated packet) documenting the investigation conducted by the Department of Children and Family Services (Department), the recording of the "Victim-Sensitive Interview" (VSI) of Elena conducted by a forensic interviewer at the Carrie Lynn Center, the records from the medical examination of Elena (MERIT records), notes from Elena's sessions with her counselor, and the caseworker's reports to the court.

¶ 4      Anita is the mother of three girls: Ireanna B., born December 10, 2000; Elena, born August 3, 2007; and Natalia O., born June 28, 2013. Carlos, the father of Natalia, lived with Anita and the girls beginning a few years before Natalia was born. At some point, Elena was diagnosed with a hearing impairment, and she had an individualized educational plan (IEP) at school.

¶ 5      On October 3, 2016, one of Elena's friends approached a cafeteria worker at their elementary school and said that a friend wanted to tell an adult about something. Elena, who was nine years old, then told the cafeteria worker that Carlos had touched her private parts. The cafeteria worker reported the allegations and the Department was contacted. The Department opened an investigation, going to the home the next day and speaking with Anita, who agreed to a voluntary safety plan that involved Carlos moving out of the home and not having any contact with the girls. (Eventually, Carlos was permitted supervised visits with Natalia.)

¶ 6      According to the notes in the indicated packet, on October 4, 2016, Elena told the investigator that Carlos twice touched her "on her private parts where the bathing suit covers over clothing" and that "it was over her pants and shirt." Elena said that the contact happened in the living room when she was watching television or in the kitchen when her mother was not around. She thought the last time it happened was the previous Sunday and also maybe on a Friday. The cafeteria worker was interviewed that same day and said that Elena had reported that her "stepfather" had touched her "outside of her clothes." The cafeteria worker said that she had not met Elena before the day of the disclosure but that Elena had begun sticking close to her teachers recently.

¶ 7      On October 19, 2016, the VSI was conducted, and Elena said that Carlos had been touching her. One day when she came home from school and went to the kitchen to get a drink, Carlos was there and asked her for a hug. He hugged her and then began touching her chest and her private parts. (Elena pointed to show where he touched her.) She was wearing a tank top and he went under her shirt. He also put his hand in her underwear and touched her "butt." He started putting his hands inside and it hurt. She told him to stop but he did not. He touched her again on

a Sunday. She had gotten out of the shower and gone to her bedroom to put her pajamas on. Her mother and Ireanna had gone to a store. Carlos went to put Natalia to sleep and then came into Elena's room and started touching her breasts and her vagina. He tried to kiss her on the breast, and she put her hands there to cover herself. He also tried to put his finger inside her and tried to hurt her. On an anatomical drawing, Elena circled the genitals. When reminded that she had mentioned her "butt," Elena also circled the buttocks area.

¶ 8      Roberto Hernandez, a Spanish-speaking child protection investigator (CPI) for the Department who was assigned to the case, spoke with Anita on the day of the VSI. (Anita did not watch or hear the VSI.) Anita said that she was "in shock" about Elena's disclosure and did not know whether to believe her. Elena was jealous of Natalia, and Carlos was never alone with Elena because Anita was always in the home.

¶ 9      That same day, Detective Juan Tapia of the Rockford Police Department also spoke with Anita. According to him, Anita thought that Elena was lying because Elena wanted her biological father (who had been arrested several years before and then deported to Mexico) back in her life. When Anita testified at trial, she denied telling Detective Tapia that she thought that Elena was lying. Instead, she said that she told him that she "had doubts" because Carlos was never home alone with any of the girls.

¶ 10      On October 20, 2016, CPI Hernandez interviewed Ireanna, then 15 years old. Ireanna said that Elena had told her about Carlos touching her, but Elena laughed and did not seem serious when she made the disclosure and Ireanna was not sure whether to believe her. Ireanna herself never felt uncomfortable around Carlos; he had been good to the family and was never inappropriate.

¶ 11      On October 21, 2016, Elena was given a medical examination to determine whether there was any physical evidence of abuse. None was found. (At trial, witnesses testified that this was not unusual given Elena's description of the contact.) During the examination, Elena said that Carlos started touching her "over the summer months." Once, when she was getting out of the shower and in her room getting dressed, Carlos came in and put his fingers in her vagina and touched her breasts. Another time, she was in the kitchen and Carlos asked for a hug and touched her under her clothes. When she said this, Elena pointed to her breast and genital areas.

¶ 12      On November 10, 2016, Detective Tapia interviewed Carlos. They spoke in Spanish because Carlos was not fluent in English. Carlos was read his *Miranda* rights and waived them. Carlos said that he had lived with Anita and the girls for six or seven years. Carlos used to babysit Elena and Ireanna all the time when they were little, and he thought of them as his own daughters. However, after Natalia was born, he began working more and stopped seeing the girls as much. Anita stayed home with them. Carlos denied any inappropriate contact with Elena. He thought that Elena was jealous of Natalia and the attention she received. Elena never spoke to him about her biological father. Currently, Carlos was trying to see the girls and spend time with the family as much as possible, taking them to church on Sunday or shopping. However, Elena was ignoring him.

¶ 13      In his trial testimony, Detective Tapia confirmed that he did not visit the home to look for any evidence, as Elena had been vague about when the abuse happened and it would be difficult to know what evidence could be found. He admitted that perhaps he could have verified certain statements by Elena (such as her description that there were no doors on the hinges in the home). Ultimately, Carlos was not charged with any criminal offense.

¶ 14    CPI Hernandez interviewed Carlos on November 23, 2016. Carlos denied ever touching Elena inappropriately and said that he was never alone with her. He worked seven days per week and was not home until late in the evening. He also said that Elena became jealous after Natalia was born. He did not mention trying to see the girls or taking the family to church or shopping. Carlos was currently living with a friend. He said that he was willing to engage in any necessary services.

¶ 15    In February 2017, an intact-family caseworker was assigned to coordinate services for the family. In mid-February, CPI Hernandez interviewed Brandi Allen, a friend of Anita and Ireanna. Allen said that she had never seen Carlos act inappropriately and was shocked by Elena's disclosure. Ireanna was at Allen's home, and CPI Hernandez spoke with her as well. Ireanna confirmed her earlier statement that Elena had told her about Carlos touching her on one occasion. Ireanna said that at first she believed her sister, "but then it didn't make any sense what she was saying" because Ireanna was always home with Elena and Carlos was always working and barely home. Ireanna felt safe in the home and was not afraid of anyone in the home. She said that Carlos had been out of the home since the previous fall and she had not seen him since then.

¶ 16    Elena began attending counseling at the Carrie Lynn Center in March. The counselor's notes from that spring reflected that Elena continued to say that Carlos had touched her the previous year.

¶ 17    On March 10, 2017, the family and Carlos (with the caseworker's permission) attended a funeral for Anita and Carlos's son. Anita and Carlos sat together in the front of the church while the children stayed with others in the back. At one point, Elena ran forward, crying and saying that she missed Carlos. Anita pulled her away and sent her back to stay with her cousins, saying that she could not be around Carlos. Carlos did not say anything to Elena.

¶ 18    In April 2017, the Department indicated Carlos for sexual abuse of Elena, based on the consistencies between Elena's initial outcry and her statements in the VSI. From October 2016 through April 2017, Elena never recanted any of her statements about the abuse.

¶ 19    Anita testified that, in June or July 2017, Elena told Anita that she had lied and that "it didn't happen." They were at a family birthday party and went to rent a movie for the party. While they were on the errand, Anita scolded Elena for taking Anita's phone and blaming it on Natalia. Anita told Elena that it was not okay to lie and make up stories on other people because they could get in trouble. According to Anita, Elena then confessed that this was not the only time that she lied—Carlos did not do anything to her. Anita testified that "at that point [she] didn't really have any words for [Elena]," and she told Elena that there was "nothing [she] could] really do at this point to help" Elena. They finished their errand and went home. According to Anita, she had never really talked with Elena about the incident other than immediately after Elena's disclosure the prior October—they did not "bring it up at all."

¶ 20    On July 20, 2017, Elena told a caseworker that she had made up the allegations of sexual abuse. Asked why, Elena said that "she thought it happened, but apparently it did not." Elena's counselor advised the caseworker that, on August 14, 2017, Elena told the counselor that the incidents did not happen. The counselor was concerned about the recantation because the counselor did not believe that the word Elena used for the denial was within her vocabulary.

¶ 21    On August 9, 2017, the State filed a petition with respect to each of Anita's three girls. The petition regarding Elena alleged one count of abuse and one count of neglect for failing to protect her from the abuse, thereby creating an environment injurious to her well-being. The

petitions regarding Ireanna and Natalia alleged only neglect based on an injurious environment.

¶ 22 Carlos completed a sexual abuse assessment, which rated him at 85% with a high risk to reoffend. He was referred for sex offender counseling (both individual and group sessions), which he attended from late July to September of 2017. Carlos's Spanish-speaking counselor, Arturo Hurtado, testified that Carlos said that he had spoken with Elena on one occasion after her disclosure. Carlos said that he talked with Elena about "the consequences" to the family of her disclosure. After that, she told people that he did not do it. Carlos did not say how long ago the conversation had happened. However, he repeated his statements about this conversation during every counseling session. Carlos also said that he went to Anita's house every day to pick up his tools and then to return them at the end of the day. On September 25, 2017, Carlos was suspended from counseling services because he continued to deny sexually abusing Elena. He would be allowed to return to counseling only if he completed a "denial polygraph." Carlos refused to take a polygraph examination. As of the time of trial, he still had not taken one.

¶ 23 The caseworker's reports to the court from October 2017 through May 2018 refer to notes from Elena's counselor. Throughout this period, Elena went back and forth about whether the sexual abuse by Carlos had actually happened. She never expressed interest in having Carlos return to live with the family.

¶ 24 Trial commenced on May 10, 2018, and continued for more testimony on June 8, 2018. Elena was the first witness. She testified in the judge's chambers, with the court reporter and the attorneys present. Elena testified that when Carlos lived in her home she was never alone with him. He ate dinner and watched TV with the family. He never did anything that she did not like or that made her feel uncomfortable. She remembered telling a school lunch lady that Carlos had touched her, but she could not remember what she had said about where Carlos had touched her. She did not remember how long ago it was. She did not tell any friends at school what happened. She did not remember talking with her mom about it. She remembered talking to the forensic interviewer and saying that Carlos had touched her private parts.

¶ 25 However, Elena confirmed that now she was saying that he did not touch her private parts. Asked to explain why she said something different earlier, she said that she could not really explain it. She had seen a video at school when she was little that involved a mother, a stepfather, and a daughter, and the little girl went to live with her biological father after she reported sexual abuse. Elena explained that she wanted to see her biological father. He was in prison once and got sent to Mexico. Elena thought that she had seen his face once on TV. Elena also thought that she was jealous of Natalia for taking Carlos from her. She never talked to Carlos about her biological father.

¶ 26 Elena said that, after Carlos moved out, she never spoke with him or saw him around the house or the garage. She missed him. Elena also testified that the last time she saw him was when she was really little and that she did not want a relationship with him.

¶ 27 Elena testified that what she said earlier (the allegation of abuse) was not true. She had told her counselor, caseworkers, and lots of people that it was not true. Asked by Anita's attorney if she was "trying to fix her mistake," Elena agreed. Asked by the guardian *ad litem* (GAL) if she thought that Carlos would be able to come home if she said that the abuse did not happen, Elena said, "I know that I told a lie to everybody. So I'm telling the truth now." The GAL asked her whether it mattered if Carlos could come home or whether she just wanted to tell the truth. Elena said that she "just want[ed] to tell the truth" because "I don't want to lie by God."

¶ 28       The State called Joanna Deuth, a forensic interviewer at the Carrie Lynn Center who had received substantial training in recantation by child witnesses, as an expert witness. Deuth first addressed the issue of delay in disclosure of sexual abuse, testifying that a child's disclosure might be delayed and might be accidental or unplanned when the abuser was a family member. Deuth then testified about recantation. She said that studies showed that between 19% and 23% of children who had made substantiated allegations of sexual abuse (that is, allegations that were independently confirmed) later recanted their allegations. Deuth said that, in "one specific research study" that she knew of, 257 children made substantiated allegations of sexual abuse and 23% of them recanted. The two primary predictors for false recantation were (1) a strong relationship between the child and the offender and (2) a low level of support from the child's primary caregiver. Children often felt responsible for negative emotional or financial consequences of their disclosure on their families. Children were often aware of whether their mothers missed the offenders, and when that was the case, that would be included in the "nonsupportive caretaker" factor. A child knowing that the mother would have married the offender if not for the allegation was a strong predictor for recantation. When an allegation was substantiated, children who falsely recanted often gave vague answers for why they had made their initial disclosures.

¶ 29       On cross-examination, Anita's attorney referred to the study that Deuth cited, noting that, although about one-fifth of children might recant even when an allegation was substantiated, about four-fifths did not recant. Deuth also acknowledged that, if vague answers about why a child made an initial allegation could indicate that the child was falsely recanting, specific answers could indicate that the recantation was true.

¶ 30       On cross-examination by Carlos's attorney, Deuth testified that there was no correlation between a child's delay in disclosing sexual abuse and whether the child was telling the truth. Children felt less pressure to recant if they did not know how their caregivers felt about their abusers. In this respect, the content of any communications between an abuser and a child, or between the caregiver and the child, was very important. Carlos's attorney asked Deuth about the recantation study but only to confirm that she was speaking about one specific study, not several. (None of the parties asked Deuth to identify the study or its authors in any way. Similarly, there was no inquiry about any of the studies to which Deuth later referred.)

¶ 31       The GAL asked Deuth if there were any studies about the predictors for children to make false allegations of sexual abuse. Deuth said no, studies showed that children tend to underreport sexual abuse; according to one study, only about 40% of victims reported such abuse. The truth or falsity of allegations had to be determined by assessing those allegations and the other evidence, and the level of detail was important in assessing both the initial disclosure and the recantation. Deuth then sought to retract her testimony that a recanting child giving specific reasons for the initial disclosure might indicate that the recantation was true: The study she cited did not suggest that but said only that vague reasons could indicate a false recantation. A child giving specific reasons for the initial disclosure could also be the result of coaching. Upon reexamination by Anita's attorney, Deuth agreed that a child who recanted under oath, saying that she just wanted to tell the truth and did not want to lie to God, would be more credible.

¶ 32       The State rested after calling Elena, Deuth, CPI Hernandez, Detective Tapia, and Hurtado as witnesses and having the exhibits admitted into evidence. Anita then presented her case-in-chief. Anita first sought to call Ireanna as a witness. However, it was clear that Ireanna

was highly anxious about testifying, and the GAL objected to her being called, on the ground that it would not be in her best interest. (The caseworker's report to the court had noted that Ireanna suffered from depression and anxiety and was being treated with counseling and medication.) With the consent of all parties, the trial court interviewed Ireanna in chambers, probing only how she felt about testifying, not the content of her testimony. The trial court reported that it observed genuine anxiety and a "tremendous amount of trepidation" in Ireanna about the process and the consequences of testifying. The trial court then considered alternatives to her testifying directly but found none of them acceptable, and it therefore denied Anita's request to call Ireanna to testify (over the objection of Anita's attorney).

¶ 33   Anita then testified. Anita stated that, during 2016, Elena and Carlos were never alone together and they were never in the house together when Anita was not there. During 2016, Carlos and Anita woke about 5 a.m. He would have breakfast with her and Natalia and would leave for work by 6 a.m., when she woke the older girls to get ready for school. He was working two jobs that year and did not return home from work until 9:30 or 10 p.m. Anita drove the older girls to school. Elena got out of school at about 2:15 p.m. and Anita would pick her up and drive her home. They would then go together to pick up Ireanna from school about 3:45 p.m. Anita always had all three girls with her when she went anywhere.

¶ 34   Anita testified about the events at the funeral in March 2017 and Elena's recantation to her in the summer of 2017. Since Elena first recanted, she had never again told Anita that Carlos actually did touch her inappropriately. Anita asserted that, although she had been in a relationship with Carlos, she would not lie for him.

¶ 35   On cross-examination, the State asked Anita about her initial conversation with Elena about her allegations. The discussion took place on October 4, 2016, after the Department investigator had finished interviewing Anita, when Elena got home from school. Anita told Elena that Elena could talk to her and that she was there for Elena and would keep her safe. She asked Elena what happened. Elena told Anita that Carlos touched her "here and there" (this may refer to gestures by Anita during her testimony; the transcript is not clear). But Elena would not look her in the face as Elena was telling her what happened, and she "had a smirk on her face." Anita initially believed Elena's disclosure. Now, a year later, she had doubts based on everything that had happened since then, but she did not necessarily disbelieve Elena. She had ended her relationship with Carlos after the disclosure. She would not definitely get back together with him if the petitions were dismissed; she would put her children's interests first.

¶ 36   Anita stated that Carlos did stop by to pick up his tools, but he went only to the garage and did not come into the house. When Carlos was in the garage, Anita tried to keep the girls out of the back room so that they would not see him. She still helped him with his business sometimes, taking phone messages for him and so on, but if she needed to talk to him about that she would go to the garage. Carlos had had no contact with the girls at all, except for the funeral and his supervised visits with Natalia. Anita had never told Elena that she missed Carlos or that she was sad that he was not living with them anymore. As far as Anita knew, Carlos had never talked to Elena about the disclosure.

¶ 37   Carlos then testified through an interpreter. He had been in a relationship with Anita starting more than seven years ago, and had one child with her—Natalia, who was born in 2013. He now had his own landscaping business. In 2016, he was working two jobs. He worked seven days per week, 10 to 17 hours per day. Before Natalia was born, he sometimes

- 7 -

took the older girls to school. After she was born, he never took them to school, as that was when he started working longer hours.

¶ 38   He recalled talking to Hurtado during counseling sessions. When Hurtado asked about the incident, Carlos told him the truth—that he had never touched Elena. He was never alone with any of the girls and never touched them, bathed them, or put them to bed. Hurtado never asked him about any conversation he had with Elena after her disclosure, and Carlos denied ever having such a conversation. Since moving out in October 2016, he was no longer in a relationship with Anita and never went to the house for any reason. He did go to the garage to get tools. He had seen Elena only at the funeral and had never spoken to her since he moved out. When he lived with the family, Anita was always present in the same room with the children and him. She did not leave the room even to go to the bathroom; she did not need to.

¶ 39   On October 2, 2018, the trial court delivered its decision. It began by noting that the central issue in the case was the two versions of events provided by Elena: her initial disclosure and her later recantation, including her testimony at trial. It noted that the State bore the burden of proving its allegations by a preponderance of the evidence. The trial court then stated that it had reviewed the recording of the VSI, noting that Elena's statements were "very detailed." It also noted that Elena had a rapport with the interviewer and spoke freely, not hesitating to answer questions or equivocating. Elena had "a reasonably decent memory of specific acts" and "also demonstrated the alleged abuse with her hands." Overall, the trial court found her statements in the VSI "quite credible."

¶ 40   In comparison, Elena had made statements in her recantation that did not seem credible to the trial court, applying the standard of what a reasonable person would find credible. For instance, she testified that she had never been alone with Carlos, despite the fact that he had been a trusted member of the household. She also said that Carlos never drove her anywhere, which seemed unlikely. And her explanations for her initial disclosure and for her recantation "simply didn't strike the Court as credible either." Her demeanor during her trial testimony was "considerably more tentative" than during the VSI. Based on its observations of Elena, the trial court found that the State had met its burden of proving that Carlos more likely than not did sexually abuse Elena. The trial court therefore found that the State had proved both counts of the abuse and neglect petition regarding Elena.

¶ 41   The trial court also found that the State had proved the neglect of Natalia. It acknowledged that an injurious environment as to one child was not necessarily an injurious environment as to the other children in the home. However, in this case Natalia was very young and highly dependent on her caregiver to keep her safe, and thus her presence in an environment where abuse had occurred posed a risk that "would certainly be injurious to her welfare." Ireanna, by contrast, was nearly an adult herself. Although the environment was the same, it affected each child differently, and given Ireanna's greater ability to provide for her own safety, the State had not proven that the environment was injurious to her. The trial court therefore dismissed the neglect petition regarding Ireanna.

¶ 42   Anita filed a motion to reconsider, which the trial court denied. This appeal followed.

## II. ANALYSIS

¶ 44   Anita raises two issues on appeal. First, she argues that there was insufficient evidence to prove that Elena was abused (and thus that Elena and Natalia were neglected) because that finding was based solely on Elena's unsworn and uncorroborated statements and it disregarded

Elena's sworn testimony that no abuse occurred. Second, she contends that the trial court erred in allowing Deuth to testify regarding an unidentified study of children who had recanted despite substantiated allegations of abuse.[1] Both of these arguments lack merit.

¶ 45                                    A. Sufficiency of the Evidence

¶ 46     Anita argues that the evidence of abuse was insufficient as a matter of law because the trial court's finding rested solely on Elena's outcry statements and the VSI. Anita points to section 2-18(4)(c) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-18(4)(c) (West 2016)), which provides:

> "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect."

Anita argues that Elena's statements were uncorroborated by any independent evidence (*i.e.*, evidence other than the statements themselves, whether reported by Elena or other witnesses) and were not subject to cross-examination. Thus, she contends, those statements were insufficient to support the trial court's findings of abuse and neglect.

¶ 47     In *In re A.P.*, 179 Ill. 2d 184, 196 (1997), our supreme court explained that "[t]he underlying purpose of section 2-18(4)(c) is to provide a means of proving abuse or neglect in cases where the minor is reluctant or unable to testify." In such a case, the minor's statements may still be used to support a finding of abuse or neglect, so long as those statements are corroborated by some other evidence. *Id.* at 197. "[C]orroborating evidence" under section 2-18(c)(4) is "independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred." *Id.* at 199; see also *In re An. W.*, 2014 IL App (3d) 130526, ¶ 63 (corroborating evidence "can be provided through circumstantial evidence, such as a medical report or examination indicating signs of sexual abuse, other physical evidence, eyewitness testimony, or an admission by the accused"). However, under the plain language of section 2-18(c)(4), the statements need not comply with both prongs of the statute: either (a) corroboration of the statements or (b) the statements being subject to cross-examination is sufficient to permit the statements to serve as the basis for a finding of abuse or neglect. *A.P.*, 179 Ill. 2d at 196.

¶ 48     Anita's argument fails because Elena's statements were "subject to cross-examination." Elena testified at trial, she was questioned by both Anita's and Carlos's attorneys as well as the State and the GAL, and she answered all of the questions put to her. No more is required to show that her statements were "subject to cross-examination." In *A.P.*, the supreme court equated being "subject to cross-examination" with the act of testifying. See *id.* at 197 ("where a minor [(who made a statement)] is unable or unwilling to testify, such as where the minor is very young," the minor "will not be subject to cross-examination" and corroboration thus

---

[1]Anita also listed a third issue in her statement of the issues on appeal: whether her trial counsel provided ineffective assistance by failing to raise the first two issues. However, she included no discussion or analysis of this issue in her brief. Thus, it is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016); *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56 (where a party does not offer any argument or meaningful authority in support of an issue, the issue is forfeited).

becomes important). Because Elena testified and was subject to cross-examination, her earlier statements did not need to be corroborated in order to serve as the basis for the findings of abuse and neglect.

¶ 49    Anita argues that Elena's outcry statements and those made during the VSI were not truly subject to cross-examination through her testimony because at trial she did not testify in accord with those statements; rather, she denied that those statements were true. Anita argues that section 2-18(4)(c) "implicitly requires" that the accused or the parent have the opportunity to cross-examine the minor about the allegations of abuse. However, there is no such requirement in the language of the statute, and we are not authorized to add one. *People v. Patterson*, 2014 IL 115102, ¶ 49 (courts may not add provisions to those imposed by the plain language of a statute). Nor has Anita cited any case law to support her reading of the provision. Indeed, although there is not much case law on the issue, the precedent that exists is to the contrary.

¶ 50    In *An. W.*, 2014 IL App (3d) 130526, ¶ 64, the reviewing court rejected the interpretation of section 2-18(4)(c) urged by Anita here. In that case, three children initially reported that their father had sexually abused them. They later recanted, and at the adjudicatory hearing on the abuse and neglect petitions filed by the State, they testified that their prior statements had been lies or that they had not made those statements. The trial court nevertheless found that the father had abused the children. On review, the father argued that the finding violated section 2-18(4)(c) because it was based solely on the children's prior statements, which were not corroborated by any independent evidence. The reviewing court held that "corroboration was not required because all three of the [(alleged)] victims *** testified at the adjudicatory hearing." *Id.* Even though the children's testimony disavowed, rather than confirmed, their prior statements, they were all questioned about why they had made their prior statements, and both their prior statements and their recantations were subject to full inquiry by all of the parties. *Id.* Thus, the children's prior statements were "subject to cross-examination" within the meaning of the statute and corroboration was not required.

¶ 51    In this case, just as in *An. W.*, both Elena's prior statements and her trial testimony recanting those statements were available for full exploration and inquiry at trial. Because Elena was "subject to cross-examination" about her prior statements, they could serve as the basis for the trial court's findings of abuse and neglect without the need for corroboration.

¶ 52    Anita further argues that, even if section 2-18(4)(c) did not bar the use of Elena's prior statements as the sole basis for the trial court's findings, those statements were contradictory and unreliable, while Elena's trial testimony was forthright and showed a consciousness that she was sworn to tell the truth. Thus, Anita argues, the trial court erred in finding Elena's prior statements more credible.

¶ 53    As Anita acknowledges, a trial court's findings of abuse or neglect following an adjudicatory hearing will not be disturbed unless it is against the manifest weight of the evidence. *A.P.*, 179 Ill. 2d at 204. A finding is against the manifest weight of the evidence when "the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007). In considering the evidence presented at trial, we defer to the trial court because of its superior opportunity to "observe the demeanor of the witnesses while testifying, to judge their credibility[,] and to determine the weight their testimony and the other trial evidence should receive." *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 72. Accordingly, we "may not substitute our judgment for that of the trial court regarding the

credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Tully v. McLean*, 409 Ill. App. 3d 659, 670-71 (2011).

¶ 54    Anita argues that the trial court's findings were influenced by its belief that recantation testimony should be viewed skeptically. During the parties' closing arguments, the trial court commented that it was aware of criminal cases in which this principle had been applied, and it asked the attorneys if they knew whether the same principle would apply in cases under the Act. The State (which had not made any such argument in its closing) advised the trial court that it was not aware of any case law regarding the issue. The trial court then invited all of the attorneys to submit case law on the issue within two weeks if they desired. However, when the trial court announced its decision (over a month later), it made no mention of the issue. Accordingly, the record does not support an inference that the trial court actually viewed Elena's testimony skeptically simply because it was a recantation. Further, even if the trial court had, Anita does not cite any authority that doing so was improper.

¶ 55    Anita also argues that the trial court improperly focused only on the VSI when finding Elena's prior statements more credible than her recantation and failed to consider the inconsistencies in those prior statements. For instance, Elena initially reported that Carlos had touched her on her breast and private parts over her clothes, but in the VSI and at the MERIT examination she said that Carlos had touched her under her clothes. And although Elena said in the VSI that Carlos had touched her "butt," she did not circle the buttocks on the anatomical drawing until asked about it by the interviewer. Anita also points out that Elena's recantation testimony was sworn (unlike her prior statements) and that Elena demonstrated an understanding of the seriousness of her obligation to tell the truth.

¶ 56    However, the trial court was well aware of all of these points, which Anita's and Carlos's attorneys stressed during their closing arguments. Further, the trial court correctly noted that there were weaknesses in Elena's trial testimony as well, such as her testimony that Carlos had never been alone with her (the trial court found, and we agree, that this statement strains belief given that Carlos was a trusted household member for years), had never driven her in a car (Carlos testified that he used to drive Elena and Ireanna to school and told Detective Tapia that he still drove them to go shopping and to church), and never spoke with her after he moved out (this was contradicted by his statements to his counselor). In short, although the evidence was conflicting, those conflicts were within the trial court's purview to resolve and much of the conflicting evidence supported its finding that Elena's recantation was not believable. The record thus does not permit us to conclude that the trial court's findings were arbitrary, unreasonable, or not based in the evidence. See *Samour*, 224 Ill. 2d at 544.

¶ 57                    B. Expert Witness Reliance on an Unidentified Study

¶ 58    Lastly, Anita argues that the trial court erred when it permitted Deuth to testify regarding a study of child recantation in substantiated abuse cases without identifying the study's author or publication details. Anita did not raise any objection at trial regarding Deuth's testimony about this study (or any other study Deuth mentioned). And on cross-examination, Anita did not ask Deuth about the author or publication details of the study; to the contrary, she relied on Deuth's references to the study to establish various points favorable to her. Anita also referred to the study in her closing argument. Under these circumstances, we find that Anita actively acquiesced in Deuth's references to the study, despite the lack of testimony regarding the study's foundational details. We therefore will not consider her current contention that

- 11 -

allowing the references to the study was error. See *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) ("a party cannot complain of error *** to which that party consented").

¶ 59                                                III. CONCLUSION

¶ 60          For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

¶ 61          Affirmed.