2019 IL App (2d) 190638-U
No. 2-19-0638
Order filed December 13, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | |
|---|---|
| *In re* S.S, W.L., M.L., N.R., E.G., I.G., and L.G., Minors | Appeal from the Circuit Court of Winnebago County |
| | |
| | Nos. 18-JA-308 |
| | 18-JA-309 |
| | 18-JA-310 |
| | 18-JA-311 |
| | 18-JA-312 |
| | 18-JA-313 |
| | 18-JA-314 |
| | |
| | Honorable |
| (People of the State of Illinois, Petitioner-Appellee, v. Maria S., Respondent-Appellant). | Francis M. Martinez, Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Presiding Justice Birkett and Justice Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*: Respondent forfeited her arguments regarding the documentary evidence submitted by the State at the adjudicatory hearing, so we could not say that the trial court's rulings, which were based on those documents, were against the manifest weight of the evidence. Even otherwise, respondent's argument failed on the merits. Additionally, the trial court's dispositional orders giving guardianship of the children to DCFS were not against the manifest weight of the evidence or an abuse of discretion. Therefore, we affirmed.

¶ 2   Respondent, Maria S., appeals from the trial court's orders adjudicating seven of her children neglected, and from its dispositional orders giving guardianship of the children to the

Department of Children and Family Services (DCFS). Respondent argues that the adjudication orders were against the manifest weight of the evidence, and that the dispositional orders were an abuse of discretion. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State filed petitions on September 17, 2018, alleging that the children were neglected minors because their environment was injurious to their welfare, in that respondent had prior "indicated" reports[1] regarding the minors and had mental health issues and symptoms that prevented her from properly parenting, thereby placing the minors at risk of harm. See 705 ILCS 405/2-3(1)(b) (West 2018).

¶ 5      According to a DCFS "Statement of Facts" dated August 21, 2018, and filed on October 17, 2018, respondent had seven children and was pregnant. On July 8, 2018, DCFS received a call that respondent claimed to be receiving messages from spirits that she had to leave her four oldest children at an unknown address, or her other children would not be safe. She also said that a man was coming on a plane at 1:45 p.m. During a visit to the house, respondent stated that she was fearful due to an attempted break-in at the residence. She said that she did not allow the children outside and only left the house every three days, to get groceries. A 2013 report stated that respondent had been diagnosed with bipolar disorder but declined medication because she felt fine. Respondent had four indicated cases and was not open to receiving services.

¶ 6      Another DCFS report, dated October 16, 2018, and also filed on October 17, 2018, stated that respondent's home was appropriate for the children, there was ample food, and the children

_____

[1] An "indicated" report is one where a DCFS investigation determines that credible evidence exists of the alleged abuse or neglect. 325 ILCS 5/3 (West 2018).

appeared cared for, though the younger children appeared to need more supervision than respondent could provide. Respondent was still declining services.

¶ 7    A shelter care hearing took place on October 17 and 18, 2018, after which the trial court found probable cause that the children were neglected, but not an immediate and urgent necessity to remove them from respondent's care.

¶ 8    The State filed amended neglect petitions on January 10, 2019, that added two counts. The allegations in count II overlapped with those in count I. Count II alleged that the children's environment was injurious to their welfare because respondent had mental health issues that prevented her from properly parenting, thereby placing the minors at risk of harm. See 705 ILCS 405/2-3(1)(a), (b) (West 2018). Count III alleged that the children's environment was injurious to their welfare in that respondent had failed to ensure that some of children received recommended mental health treatment,[2] thereby placing the children at risk of harm. See *id.* The counts for N.R. differed slightly in that the above-mentioned counts were alleged as counts III and IV, respectively. N.R.'s count II alleged educational neglect. See 705 ILCS 405/2-3(1)(a) (West 2018).

¶ 9    A Children's Home & Aid report to the court dated January 8, 2019, was filed on January 11, 2019, and stated as follows. Respondent said that the hotline call to DCFS was about a dream that she had described. Respondent had completed a mental health assessment and been diagnosed with PTSD and anxiety. It was recommended that she take medication, but respondent refused because she did not think she needed it. It was also recommended that respondent participate in individual and group counseling, but she did not want to participate in groups because she did not want to listen to other people's problems, and she did not have anyone to watch the children. The

_____

[2] The petitions for L.G. and E.G. stated that they needed the mental health services.

caseworker told respondent that she could apply for protective daycare for the younger children, but respondent replied that she had trust issues and did not feel comfortable with others watching her children. At a later date, respondent stated that her boyfriend was watching the children while she went to counseling appointments, but she refused to provide his information for the caseworker to do a background check. She also refused to sign medical releases, even to verify her assertion that she had a high-risk pregnancy. Respondent further refused to put outlet covers in the home, even though she had one- and two-year-old children, because she said that her children knew better than to put their fingers in outlets. Respondent was also transporting the children in Ubers without car seats because she did not want to carry car seats everywhere. Respondent stated that when her baby was born, the baby would sleep in bed with respondent, despite the caseworker informing her of the risks of co-sleeping.

¶ 10    The report continued that respondent gave birth to a baby girl on November 23, 2018. Subsequently, respondent informed the caseworker that she practices the "Babalu" religion and did not want anyone to take pictures of the baby until she was baptized. She believed that her dreams gave her messages about the future. On December 3, 2018, respondent stabbed the bassinette with a knife, threw it outside, and threatened to leave the baby outside on the porch if the baby's father did not come to get her. Respondent had missed various individual and group therapy sessions, and her counselor was concerned about her ability to take care of the children. On December 14, 2018, respondent reported to the caseworker that she had crying spells and that her mental health provider recommended a two-week inpatient program, but respondent did not have anyone to watch her children for that long. A few days later, respondent told the caseworker that she had an argument with the baby's father, and he took the baby to his grandmother's house. Respondent then went there with the police to get the child back. Respondent continued to miss

counseling and psychiatric appointments. She also missed "IEP" meetings scheduled for one of the children. The eldest child had attended only 11 full days of middle school. The elementary-school-aged children were generally arriving one to two hours late to school. The caseworker had observed the baby being propped up with a blanket on her side to drink from the bottle, and she told respondent that this practice was unsafe because the baby was not strong enough to move the bottle away and could suffocate. Respondent replied that even though the baby was premature, respondent had observed her hit the bottle away when she did not want it anymore. Respondent continued to leave blankets and other objects in the crib and pack and play with the baby, even after the caseworker warned her of the dangers. The caseworker also observed that respondent left the second youngest child, S.S., in the crib in the bedroom and did not give him attention.

¶ 11    Another shelter care hearing took place on January 16, 2019, after which the trial court found probable cause that the children were neglected, and an urgent and immediate necessity that they be removed from respondent's care. The trial court gave temporary guardianship and custody of the minors to DCFS, with visitation with respondent at DCFS's discretion. The trial court stated that there was not one particular issue that was controlling, but rather its ruling was based on the totality of the circumstances. Respondent had minor symptoms of depression, but on top of that were glaring deficits in parenting, such as propping the baby up with a bottle and leaving blankets in the crib. Respondent was also unwilling to sign releases to verify information, which raised a "red flag" to the trial court, and she was not getting her children to school on time.

¶ 12    An adjudicatory hearing took place on March 18, 2019. The State presented only documentary evidence, consisting of N.R.'s education records, mental health records for L.G. and respondent, a letter from the mental health center stating that it did not have records for E.G., Lake

County Health Department records for respondent, and "indicated packets." Respondent's attorney stated that he did not have any objection to the documents being admitted into evidence.

¶ 13    Respondent then testified as follows. For the past five years, the children had been residing with her, before guardianship and custody was given to DCFS, with the exception that E.G. briefly went to live with his father after E.G. attempted suicide. Respondent had been engaged in mental health treatment most of her life. Her present diagnosis was trauma due to rape and domestic violence. Some of the children also required mental health services, and she had been ensuring that they received services. She was also properly housing, feeding, and bathing the children, and was attentive to them. Respondent had trouble getting L.G. to school on a consistent basis because respondent had high-risk pregnancies and could not get up to take her to school, and respondent did not have transportation. Respondent observed the baby when she was drinking from a bottle or had blankets near her. Further, the blankets were special breathable blankets. Respondent had concerns about S.S. because he kept bumping his head, and autism ran in respondent's family. Further, he was in a car accident in February 2018. Therefore, respondent kept him in the playpen for his safety. She took him to the emergency room but was told that he was okay. Respondent had signed papers for S.S. to see a specialist, but the children were removed from her care before S.S. was evaluated.

¶ 14    On cross-examination, respondent testified that the children received mental health services from late August to September 2016.

¶ 15    M.L.'s uncle testified by phone as a witness for respondent. He testified that he saw respondent with the children a couple of times per year and that they were in "good hands" with her.

¶ 16    On April 22, 2019, the trial court found that the State met its burden of proving all of the counts by a preponderance of the evidence. It stated that there was a long history of indicated reports dating back to 2008. There was an indicated report in 2008 of burns to L.G. There was a substantial risk of physical injury found in 2011; inadequate supervision found in 2012; environmental neglect found in 2013; substantial risk of physical injury by others found in 2016 and in June 2018; and substantial risk of serious injury in September 2018. The indicated reports created an inference that there was a long history of the children being in an environment injurious to their welfare. They showed a number of domestic violence issues to which the children were exposed, and environmental issues stemming from respondent's mental health. The records further showed respondent's need for mental health services and that she was uncooperative with services, resulting in her creating or maintaining an environment injurious to the children. The evidence also showed that L.G. and E.G. had discernable mental health issues that went unattended, and the trial court could then infer that it created an environment injurious to the health of all of the children. N.R.'s school records showed that he was educationally neglected in that he had substantial attendance issues. This occurred despite the number of interventions the school attempted through phone, mail, and in-person contact.

¶ 17    A dispositional hearing took place on June 18, 2019. We summarize the testimony of Deborah Massey, the case manager. She had become the case manager at the beginning of April 2019. Respondent had reported living in multiple places, including out of her car, and Massey had not been able to confirm any of the locations. Massey had tried to set up an integrated assessment of respondent directly and through her attorney, but respondent did not want to discuss the issue. Respondent had also not completed a new service plan. Respondent mentioned that she was

involved in counseling and had signed consents, but before Massey could receive the updates, respondent revoked the consent.

¶ 18 Massey had tried to set up visitation, but she was either not able to reach respondent, or respondent was not willing to talk. Respondent last visited the children about two months before, which respondent had arranged directly with the foster parents. Massey received information that respondent was discussing the case by phone with some of the children, which was causing them anxiety.

¶ 19 Upon the State's request, the trial court took judicial notice of the evidence and testimony from the adjudication hearing and the reports to the court dated May 20, 2019, and June 18, 2019.

¶ 20 Respondent testified as follows. She owned a four-bedroom, three-bath home in Rockford. She was employed at Papa John's in Waukegan and was on the waiting list for housing with the Waukegan Housing Authority. If the children came back to live with her, they would live in Rockford, but her long-term plan was to relocate to Waukegan. Respondent was trying to enlist in the army and had asked her sister to take care of the children for the three-month boot camp. Her sister had said that she first wanted respondent to "cross that bridge," and then they would "sit down and talk" about it.

¶ 21 Respondent had been attending counseling in Waukegan weekly beginning in mid-April 2019 and was currently waiting to get a new counselor. She had just taken an assessment to attend parenting classes. Respondent denied that Massey had made any effort to meet with her before the prior week. Respondent was told by another DCFS office and a Rockford detective that she could not have any contact with the children until an accusation against her of child molestation was resolved. Respondent felt that her mental health had always been properly managed, but that the

current counseling was providing additional help. Other than very recently, the children had been in her care virtually their entire lives.

¶ 22    On cross-examination, respondent testified that she had been going back and forth from her house in Rockford to Milwaukee and to Waukegan. When she was in Milwaukee, she stayed with a friend. She spent the night in her car the majority of the time when she got called to work at Papa John's because she worked late, and it was a two-hour drive back to Rockford.

¶ 23    Respondent had signed consents for DCFS to see the dates she was attending counseling, but not for other information. Respondent had not spoken with Massey directly because respondent did not have a phone to call her or e-mail to reach her. She had showed up to the office four times without making an appointment but was never able to talk to Massey.

¶ 24    The trial court stated that it had previously found that respondent had a long history of mental health issues that prevented her from parenting property, so respondent's mental health was the main condition that had to be cured to find fitness. However, there was no evidence presented that the condition had been resolved and that she was fit, willing, and able to provide a safe and protective household. Respondent testified that she was attending counseling, but there was no verification of the testimony. Massey testified that respondent revoked her releases, whereas respondent testified that she signed a very limited release as to only the dates she was attending counseling. Either way, the releases were insufficient. That is, the trial court could not find fitness based on nebulous testimony about counseling when it did not know what issues the counselor was addressing or whether any progress was being made.

¶ 25    The trial court adjudicated the minors wards of the court and found that guardianship should be vested with DCFS, with visitation in its discretion. It ordered respondent to sign releases to DCFS for all of the services that she was engaged in.

¶ 26    Respondent timely appealed.

¶ 27                                II. ANALYSIS

¶ 28    Respondent first argues that the trial court's determination, that the State proved by a preponderance of the evidence that the children were neglected, was against the manifest weight of the evidence. According to respondent, the State alleged that she had mental health issues that inhibited her ability to parent, and that she was not taking care of her children's needs, including health and educational needs. She maintains that the State presented no witnesses but merely introduced a mountain of documentary evidence in support of its neglect petitions. She argues that while the evidence was admissible as an exception to the hearsay rule, it was to be weighed against the other evidence. Respondent points to her own testimony that she was able to properly feed, house, and bathe the children; that she was engaged on and off in mental health counseling for most of her life; that her children were safe with her; and that she provided them with mental health treatment. Respondent asserts that in contrast to her testimony, the State's evidence was not subject to cross-examination and contained double hearsay in some places.

¶ 29    At an adjudicatory hearing, the trial court must determine whether a preponderance of the evidence shows that the minor is abused, neglected, or dependent. 705 ILCS 405/1-3(1), 2-21(1) (West 2018). A trial court's finding of abuse or neglect will not be reversed unless it is against the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident, or the finding is arbitrary, unreasonable, or not based on the evidence. *In re Natalia O.*, 2019 IL App (2d) 181014, ¶ 53.

¶ 30    As to respondent's argument that the documentary evidence was not subject to cross-examination, respondent herself acknowledges that the records of a public or private agency are admissible at adjudicatory hearings as business records, and indicated reports are similarly

admissible. See 705 ILCS 405/2-18(4)(a), (b) (West 2018); *In re Brandon A.*, 395 Ill. App. 3d 224, 235 (2009). Respondent also argues that there was multilevel hearsay within the records, but the documents were admitted into evidence without objection by respondent, resulting in forfeiture of any objection to their admission on appeal. See *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41. Respondent's argument is also forfeited due to her failure to specify what portions of the voluminous records contain the alleged double hearsay, and her failure to cite authority stating that such information was inadmissible or entitled to less weight than in-person testimony. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (argument shall contain citation of authorities and pages of the record relied on). That is, a reviewing court is not a repository into which an appellant may dump the burden of argument and research, nor is it our obligation to act as an advocate, and the failure to clearly define issues and support them with authority results in forfeiture of the argument. *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 33. As respondent has forfeited any objections to the documentary evidence submitted by the State, it cannot be said that the trial court's ruling was against the manifest weight of the evidence.

¶ 31 We would reach the same conclusion even looking at the content of the documents as compared to respondent's testimony. The documents reveal numerous prior indicated findings by DCFS. Specifically, in 2008 respondent was indicated for burns by neglect after L.G. burned herself on hot soup that respondent left unattended. In 2011, respondent was indicated for substantial risk of physical injury and the children's environment being injurious to their health and welfare. Respondent said that she was going to kill L.G. and I.G., they had bruises from respondent hitting them, the home was roach-infested and full of garbage, and respondent had run out of medication to treat her bipolar and schizophrenic conditions. In 2012, respondent was indicated for inadequate supervision. She was absent from the home for a week, and the adults in

the home did not know where she was and did not appear capable of caring for the children. The home was roach-infested and had animal feces and urine everywhere. N.R. was found lying on a black crib mattress with a diaper that had not been changed in about two days. In 2013, respondent was indicated for environmental neglect after being found living in a home that was marked uninhabitable, with no running water or heat, and that was filthy and with beer bottles all around. Domestic incidents with paramours took place in the children's presence in 2016 and 2018. Respondent was indicated in 2018 for substantial risk of physical injury and an environment injurious to health and welfare by neglect, based on respondent's messages from spirits and her refusal to engage in mental care.

¶ 32    N.R.'s educational records show that out of a period of 132 attendance days, he had 65 unexcused absences, 14 excused absences, and 16 tardies. The records also showed that the school repeatedly contacted respondent about N.R.'s absences and tardies, without improvement. Mental health records for L.G. showed that she was diagnosed with mental health issues but was missing counseling appointments without notice. There were no mental health records for E.G. from the mental health center, despite his prior suicide attempt. Respondent's mental health records showed that she was not compliant with the treatment plan recommended by her counselor.

¶ 33    Respondent testified that she had been receiving mental health services for most of her life, but she did not dispute that she was not currently compliant with her treatment plan, and she did not provide any evidence of attendance at other services or progress. She testified that the children received mental health services in 2016, but she did not testify that L.G. and E.G. were currently receiving such services. She also did not offer any testimony regarding N.R.'s attendance at school, or about the numerous, prior indicated reports. Accordingly, the trial court's ruling, that the State

proved by a preponderance of the evidence shows that the minors were neglected as alleged in the January 2019 petitions, was not against the manifest weight of the evidence.

¶ 34    Respondent next argues that the trial court's dispositional order was an abuse of discretion, because the State did not sustain its burden to prove that she was unfit. Respondent argues that the State's use of Massey as a witness did not lend much clarity to the State's evidence, as Massey had been the caseworker for only about two months. Respondent maintains that Massey's testimony can be summarized as her opinion that respondent was not communicating and was not engaged in services. Respondent argues that the remainder of the State's evidence was documentary, whereas she rebutted both Massey's testimony and the documentary evidence with her own testimony, which was subject to cross-examination. Respondent points out that she testified that she owns a four-bedroom home in Rockford; that she is employed at Papa John's; and that she was engaged in counseling and had enrolled in parenting classes.

¶ 35    After an adjudication of neglect or abuse, the trial court must hold a dispositional hearing to determine whether it is in the best interests of the minor and public for the child to be made a ward of the court. 705 ILCS 405/2–22(1) (West 2012); *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 58. The trial court may give guardianship of the child to DCFS if the trial court determines that the parent is unable, unwilling, or unfit "for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor *** and that the health, safety and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27(1) (West 2018). The State must prove a parent's "dispositional unfitness" by a preponderance of the evidence, and we will not disturb the trial court's ruling unless its findings of fact are against the manifest weight of the evidence or it abused its discretion by selecting an inappropriate dispositional order. *In re A.T.*, 2015 IL App (3d) 140372, ¶ 13.

¶ 36    We conclude that the trial court's factual findings were not against the manifest weight of the evidence, nor did the court abuse its discretion in adjudicating the children wards of the court and awarding guardianship of them to DCFS. As the trial court emphasized, the main concern surrounding respondent's fitness to take care of the children stemmed from her own mental health issues and failure to demonstrate that she was seeking help. Respondent asserts that she countered these concerns through her testimony. However, although respondent testified that she was attending counseling, she had not provided any verification. Massey testified that respondent had revoked releases regarding her mental health records before Massey could obtain them. Even accepting respondent's testimony that she signed releases only as to the dates she attended, such records would be insufficient to show what mental health issues respondent had, and whether she was progressing in treating the issues.

¶ 37    We note that respondent's remaining testimony also largely supported the State's assertion that she was unable, unwilling, and/or unfit to care for the children. Respondent testified to owning a home in Rockford but also testified that she had also been frequently staying in Milwaukee and Waukegan. She testified that she was working at a Papa John's in Waukegan and sleeping in her car there after work, but she did not explain why she could not find a similar job close to her house. Respondent wanted the children returned to her but also wanted to enlist in the military, which would require a three-month boot camp, without any certain plans as to where the children would stay during that time. Additionally, Massey testified that respondent was not cooperative in setting up an integrated assessment, service plans, or visitation, and that respondent was discussing the case with some of the children. Finally, the court took judicial notice of evidence and testimony from the adjudication hearing, without objection by respondent. In light of all of the evidence presented, we find no basis to disturb the trial court's rulings.

¶ 38                                    III. CONCLUSION

¶ 39    For the reasons stated, we affirm the judgments of the Winnebago County circuit court.

¶ 40    Affirmed.