2026 IL App (2d) 250299-U
Nos. 2-25-0299 & 2-25-0300 cons.
Order filed March 10, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_In re_ A.R. and N.R., Minors

(The People of the State of Illinois, Petitioner-Appellee, v. Sarah B., Respondent-Appellant.)

Appeal from the Circuit Court of Kane County.
Honorable Kathryn D. Karayannis, Judge, Presiding.
Nos. 22-JA-64, 22-JA-65

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    _Held_:    The trial court did not err in terminating respondent's parental rights where the evidence supports its finding that respondent was an unfit parent and that termination of her rights was in the children's best interests.

¶ 2    Respondent, Sarah B., appeals, _pro se_, from orders of the circuit court of Kane County terminating her parental rights to her children, A.R and N.R. (the minors).[1]   She raises various

---

[1]The parental rights of Darryl R., the minors' putative father, and of John Doe and any unknown fathers were terminated in the same proceedings but are not at issue in this appeal.  The minors also have an older half-sister, L.B., who was placed with her natural father and whose status is likewise not at issue in this appeal.

arguments challenging both the trial court's finding that she was an unfit parent and its finding that termination of her parental rights was in the children's best interests. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On May 16, 2022, the State filed amended petitions for adjudication of wardship regarding the minors, twins girls born in June 2016, who had been taken into protective custody by the Department of Children and Family Services (DCFS) on May 5, 2022. The petitions alleged that the minors were neglected pursuant to section 2-3(1)(d) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(d) (West 2020)) in that they were left without supervision for an unreasonable period of time without regard for their mental or physical health, safety, or welfare, when respondent left them unsupervised and they went onto the roof of a two-story home.

¶ 5      The original petitions for adjudication of wardship were filed on May 9, 2022. At a hearing that same day, Jessica Garcia, a DCFS investigator, testified that the minors were taken into protective custody after they had climbed out of an attic window and were found on the roof of the two-story home where they lived with respondent and their older sister. The minors had thrown their pet bunny from the roof. Respondent was at home at the time of the incident. Garcia further testified that this was respondent's fifth DCFS investigation since 2018, three of which were indicated. Specifically, respondent was indicated: (1) in May 2018 for leaving the minors unsupervised in a running vehicle; (2) on May 10, 2020, after the minors were found alone in the street at about 10 p.m. and were nearly struck by a vehicle; and (3) during Memorial Day weekend 2020, when respondent left the minors home alone with their nine-year-old older sister, L.B., for about two hours. For the latter incident, respondent pleaded guilty to child endangerment. An intact family case was opened in 2020 and successfully completed in 2021. Respondent testified that, with respect to the present incident, she had been on the phone with her priest for

approximately 90 minutes when the minors went onto the roof. Following the hearing, the trial court entered a written order granting temporary custody of the minors to DCFS, noting that respondent appeared with counsel and submitted to the court's jurisdiction. The trial court also entered an order appointing a court-appointed special advocate (CASA) for the minors.

¶ 6 The record reflects that DCFS worked with outside agencies, initially One Hope United and later Guardian Angel Community Services, and their caseworkers to coordinate services in this matter. A July 5, 2022, service plan required respondent to complete a parenting class; submit to random drug screens and maintain sobriety; obtain a mental health assessment; participate in individual therapy and parent coaching; and demonstrate an ability to meet her own needs while also meeting the minors' physical, emotional, and medical needs. The caseworker indicated that referrals would be made for these services. The record further reflects that the referrals were not made until October 2022.

¶ 7 The trial court held an adjudicatory hearing on August 3, 2022. Respondent stipulated, and the trial court found that the minors were abused and neglected in that they were under 14 years old and left unsupervised for an unreasonable period of time (*id.*). At a dispositional hearing on September 14, 2022, respondent stipulated that she was unfit and unable to care for the minors and that it was in their best interests to be made wards of the court. The court thereafter adjudicated the minors wards of the court and awarded custody and guardianship to DCFS. Respondent was ordered to engage in recommended services, visit consistently, and maintain stable income and housing. The permanency goal was set at return the minors home in 12 months.

¶ 8 A January 6, 2023, status order noted that respondent was participating in individual therapy. She had been discharged from parenting classes due to nonattendance and required re-referral. Respondent submitted to two drug drops, one of which was positive and one negative,

and failed to appear for two additional drug drops. The trial court admonished respondent that she was required to attend all drug drops and that missed drops would be considered positive.

¶ 9 An April 27, 2023, permanency order maintained the goal of return home in 12 months. The order indicated that respondent had completed parenting classes and a substance abuse assessment, which resulted in no treatment recommendations. However, respondent continued to test positive for THC. She was unsuccessfully discharged from individual therapy due to missed sessions and was re-referred. She had been visiting consistently and the visits were going well.

¶ 10 A CASA report dated September 12, 2023, indicated that respondent worked at a nightclub, a hookah lounge, and a burger restaurant. After being unsuccessfully discharged from therapy in April, she resumed individual therapy in August and was scheduled to begin parent coaching. Respondent had not been submitting to drug drops. She had weekly visitation with the minors on Saturdays from 12 to 3 p.m., supervised by the foster mother. The foster mother reported that respondent generally attended visits but did not always adhere to the scheduled times. CASA observed a visit on July 22, 2023. When respondent arrived, the minors greeted her. Respondent then sat on the couch between the minors while they watched television, and she used her phone. When asked whether she had brought any books or activities, respondent indicated that she had not. She then directed the minors to retrieve a craft box she had brought during a previous visit.

¶ 11 An October 5, 2023, agency report indicated that respondent successfully completed individual therapy on September 11, 2023. Thereafter, virtual parent coaching began because the agency was unable to find an in-person provider. At the time of the report, respondent had been scheduled for 10 drug drops; three were positive for THC, two were negative, and she failed to appear for five. Respondent reported that she was 34 weeks pregnant. She worked for a company that provided vintage items for weddings and also worked as a massage therapist. She was paid

in cash for both. Respondent was living in Chicago with a friend and attended weekly supervised visits at foster mother's home.

¶ 12    Following an October 24, 2023, permanency review hearing, the trial court maintained the goal of return home in 12 months. The court found that although respondent had made efforts, she had not made reasonable and substantial progress. The court noted concerns regarding housing and employment and respondent's failure to appear for drug drops. The court further recommended that the agency re-refer respondent for individual therapy due to inconsistencies between respondent's actions and what the therapist was reporting.

¶ 13    A November 14, 2023, service plan indicated that respondent made unsatisfactory progress toward maintaining a substance-free lifestyle, as she continued to miss drug drops and test positive for THC when she did submit to testing. Respondent gave birth to a child on October 28, 2023.

¶ 14    Agency and CASA reports filed in January and February 2024 indicated that respondent was residing in a maternity shelter and was unemployed. Respondent began in-person parent coaching in November 2023. She was permitted visitation, supervised by the agency, on Tuesdays and Thursdays for two hours. Respondent completed four or five in-person parent coaching sessions. However, based on observations by the parent coach and the foster mother during a parent-coaching session on Saturday, January 6, 2024, respondent was directed to submit to a drug drop on January 9, 2024. Respondent failed to appear but submitted to a drug drop the following day that was positive for THC. She was unsuccessfully discharged from in-person parent coaching and placed on a waitlist with a different provider. Respondent's therapist reported that she had not received a referral to resume individual therapy as previously ordered by the trial court. Respondent made unsatisfactory progress with respect to substance abuse: of 14 drug screens

scheduled between October 2022 and January 2024, she failed to appear for seven, tested positive on four, and tested negative for three.

¶ 15    At a March 8, 2024, permanency review hearing, the agency reported that respondent consistently attended Tuesday visits but failed to confirm Thursday visits in advance and therefore had only one Thursday visit. The agency made a referral for respondent to resume individual therapy and explained that the delay resulted from awaiting responses from providers regarding availability. Although respondent had been attending parent coaching on Saturdays at foster mother's home, an incident occurred and the foster mom was no longer willing to host those sessions in her home. The agency was attempting to arrange parent coaching with another provider. The agency did not schedule any drug drops for respondent in February. Respondent failed to appear for a drug drop in early March.

¶ 16    Respondent stated that her therapist was ready to resume individual therapy but that they were awaiting a referral, which had not yet been received. She was told she was on a waitlist for parent coaching. Respondent further stated that she was unaware she was required to confirm visits in advance or that visits were scheduled for both Tuesdays and Thursdays, as she believed she was permitted visitation only once per week.

¶ 17    Following argument, the trial court noted respondent's unsuccessful discharge from individual therapy and virtual parent coaching, her positive tests for THC, and her failure to appear for scheduled drug drops. The court further observed that respondent had not maintained stable housing or employment for at least one year. Nearly two years into the case, respondent remained at supervised visitation and had been missing Thursday visits. The court also expressed concern that the agency had not fulfilled its obligations, noting that respondent had not been referred for all required drug drops and that discussions regarding resuming individual therapy had been

ongoing since October without implementation. The court observed that the minors were thriving in the foster home. Although the court indicated that it wished to change the permanency goal to termination of parental rights, it concluded that it could not do so because the agency had failed to do its job. The court set the matter for another permanency review in three to four months. It admonished respondent to attend all visits and drug drops and directed the agency to ensure respondent was tested weekly. The court further emphasized that respondent needed to make progress toward obtaining suitable housing and employment. The court found that respondent had made only minimal efforts and had not been visiting consistently. It also found that the agency had not made reasonable efforts and that this deficiency was the sole reason respondent was being afforded additional time. The permanency goal remained return home within 12 months.

¶ 18    May and June 2024 service plans and CASA reports indicated that respondent continued to test positive for THC. Respondent was participating in individual therapy and making satisfactory progress. In March 2024, the agency began supervising visits at a public library. During those visits, respondent resisted assisting the minors with their homework. After the caseworker resigned, the foster mother supervised the visits at the library. On May 4, 2024, respondent arrived two hours late for a scheduled visit. After supervising four visits, the foster mother reported that respondent failed to bring activities for the minors and refused to help them with homework on multiple occasions. While a service plan indicated respondent was employed through a temporary agency and had stable housing, CASA reported that respondent rented a room from a friend in Chicago and that her employment status was unclear.

¶ 19    Following a June 13, 2024, permanency review hearing, the trial court changed the permanency goal to private guardianship, finding that return home was inappropriate because respondent continued to test positive for THC. The court stated that respondent could not attribute

- 7 -

her continued marijuana use to any deficiencies by the agency. Although the most recent reports indicated that certain services initiated weeks earlier had not yet begun, the court concluded that the agency was not responsible for delays caused by respondent's prior unsuccessful discharges and need for re-referrals. The court further noted that respondent had not found stable housing, there were conflicting reports regarding where she was employed, and she had not provided verification of income. The court also observed that respondent arrived late to visitation, did not request additional visitation, and failed to assist the minors with homework during visits. The court concluded that although respondent had made some efforts, those efforts were not reasonable and did not constitute progress. The court also found that, based on the most recent report, the agency had made reasonable efforts.

¶ 20    Agency and CASA reports filed in September 2024, indicated that respondent's last scheduled visit with the minors occurred on May 23, 2024, supervised by the foster mother at her home. The foster mother reported that respondent had been in Elgin twice without requesting visitation and had not attended the minors' birthday party. The reports also indicated that respondent was renting a room from a friend in Chicago. On October 11, 2024, a new caseworker, Eva Coe of Guardian Angel Community Services, was assigned to respondent's case. An October 23, 2024, CASA report indicated that the foster mother continued to experience problems with respondent arriving on time for visitation. On one occasion, the foster mother agreed to bring the minors to a tea party in Chicago at respondent's request, but respondent did not arrive until the event had concluded.

¶ 21    On December 30, 2024, following a hearing, the trial court set the permanency goal at substitute care pending determination of a petition to terminate parental rights. The court noted that the minors had been in the foster mother's care for two years and that respondent had not made

reasonable progress in completing her services.  The court ordered that the minors remain in the custody and guardianship of DCFS and found that the agency had made reasonable efforts and that the services were appropriate.

¶ 22    On February 13, 2025, the State filed a petition for termination of parental rights as to each minor.  The petitions alleged that respondent was unfit because she: (1) failed to maintain a reasonable degree of interest, concern or responsibility as the minors' welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failed to protect the minors from conditions within their environment injurious to their welfare (*id.* § 1(D)(g)); (3) failed to make reasonable efforts to correct the conditions that were the basis for the minors' removal or to make reasonable progress toward their return during the nine-month period being August 4, 2022, to May 4, 2023 (*id.* §§ 1(D)(m)(i), 1(D)(m)(ii)); (4) failed to make reasonable efforts or reasonable progress during the nine-month period from May 5, 2023, through February 4, 2024 (*id.*); and (5) failed to make reasonable efforts or reasonable progress during nine-month period from February 6, 2024, through November 6, 2024 (*id.*).  The State asserted that termination of respondent's parental rights would be in the minors' best interests.

¶ 23    On April 9, 2025, the trial court commenced hearing on the State's petition, which continued on two additional days.  Devin Gazelle testified that she was employed by One Hope United and had been involved with the minors' case from its opening in June 2022 until it transferred to another agency in October 2024.  Respondent was recommended for individual therapy, parenting classes, a substance abuse evaluation, random drug screens, and parent coaching.  Respondent successfully completed her parenting class and began individual therapy in October 2022, but was discharged unsatisfactorily in April 2023 due to lack of attendance.  She subsequently resumed individual therapy and was successfully discharged in September 2023.  Her

therapy addressed historical trauma, healthy relationships, grief and loss, and decision-making skills. However, concerns arose about five months later due to respondent's limited engagement with the minors, instability, and lack of making herself available to the agency.

¶ 24 A substance abuse evaluation was added to respondent's services after some of her drug screens came back positive for THC, and she never provided a medical marijuana card. Respondent was referred for 29 drug screens, of which she failed to appear for 14, 11 tested positive for THC, and 4 were negative. She completed a substance abuse assessment, but no treatment was recommended.

¶ 25 Gazelle testified that respondent began virtual parent coaching in September 2023, following completion of her individual therapy. She did not successfully complete parent coaching due to scheduling conflicts. Respondent's visitation was initially supervised by the foster mother at the foster mother's home. Respondent was consistent with visits until the birth of her child in October 2023. In early 2024, the foster mother declined to continue supervising visitation because respondent would show up and prioritize personal tasks, such as doing laundry, rather than engaging with the minors. Respondent was frequently late, missed visits, or arrived at unscheduled times. As a result, the agency assumed supervision of visits. Respondent was required to confirm visits in advance, which she failed to do, leading to additional missed visits. During agency-supervised visits, respondent was largely passive and did not actively participate with the minors. Based on her service participation and progress, the agency never recommended unsupervised or overnight visits. Respondent did not have stable housing until May 2024 and never maintained consistent employment or provided proof of income.

¶ 26 On cross-examination, Gazelle acknowledged the frequent changes in respondent's caseworker but testified that she had consistently served in a supervisory role overlooking

respondent's case and filled in for any caseworker gaps. After respondent was discharged from individual therapy in April 2023 due to sporadic attendance, Gazelle re-referred respondent for individual therapy that same month. She testified that respondent had the following caseworkers: Jimmiria Porter from May to October 2022; Kimdra Harris from October 2022 to October 2023; Andrea Salas for about a month; Porter from January 2024 to May 2024; and Elisa Ransome from May 2024 until October 2024.

¶ 27 Kenyatta Williams testified that she was a parent coach. Respondent was referred for in-person parent coaching in October 2023 to help her reconnect and bond with the minors, understand their needs, and address the issues that led to their removal. Despite attempts to schedule something sooner, the first session occurred in November 2023 at the foster home with respondent, her newborn, and the minors. During that session, respondent interacted with the minors by teaching them how to feed the baby with a bottle. However, she did not actively participate in activities with the minors and primarily attended to her newborn. The sessions generally lasted one to two hours. Respondent completed five sessions over a three-month period. At the final session, on January 6, 2024, respondent appeared withdrawn and explained that she had taken Benadryl. The foster mother informed Williams of respondent's history of marijuana use and stated that she would no longer host the parent coaching sessions in her home. Williams unsuccessfully discharged respondent due to alleged marijuana use and the inability to secure an alternative time and location for the sessions. Williams encouraged respondent to submit to a drug drop to prove she was not under the influence at the final session, but respondent refused.

¶ 28 On cross-examination, Williams acknowledged that respondent had been participating well and making progress prior to the unsuccessful discharge. She explained that parent coaching did not resume because, without the foster parent hosting the sessions on weekends, the sessions had

- 11 -

to occur during the week. Williams, respondent, and the agency were unable to find a mutually available time for the sessions that worked for the minors as well.

¶ 29 Shantina Griffin testified that she was a therapist. Respondent was referred to Griffin for individual therapy in October 2022 and for parent coaching in June 2023. Respondent began missing sessions in December 2022 and was discharged unsuccessfully in April 2023 due to lack of attendance. She was subsequently re-referred, and counseling resumed. The sessions addressed past trauma involving respondent's own mother, grief associated with losing custody of her children, and decision-making skills. Respondent successfully completed individual therapy in September 2023. At the request of the trial court, she was again referred for individual therapy near the end of 2023. Griffin also conducted virtual parent coaching with respondent beginning in June 2023, which lasted approximately six months. When in-person sessions became necessary, respondent was no longer within Griffin's service area, and the agency indicated it would assign a different provider to continue parent coaching.

¶ 30 On cross-examination, Griffin testified that respondent expressed frustration during their sessions, complaining about caseworker changes and difficulty contacting her caseworker. After being discharged in April 2023 due to sporadic attendance, respondent resumed therapy in June or July 2023. Griffin noted that the delay in resuming therapy was longer than necessary because the agency did not respond promptly to her calls and emails requesting a new referral. During virtual parent coaching, which did not include the minors, they discussed appropriate disciplinary techniques, decision-making, and budgeting and finances. Respondent successfully completed virtual parent coaching.

¶ 31 Respondent testified on her own behalf that the minors were removed from her care in May 2022. She was not offered any services until Harris was assigned to her case in October 2022.

She initially stopped attending individual therapy because the sessions began addressing past trauma with her own mother, which she found emotionally difficult. After missing three sessions, she was discharged unsuccessfully in April 2023. She did not resume therapy until June 2023, due to difficulty obtaining a re-referral from Harris.

¶ 32    Respondent further testified that, during a substance abuse assessment in February 2023, she stated that she needed therapy to address her marijuana use, but the provider concluded that no services were necessary. She explained that she used marijuana as a coping mechanism and informed Porter and Ransome that she wanted to participate in a program to help her stop. Respondent stated that she missed some drug drops due to lack of money for transportation, early closure of testing sites, or insufficient advance notice.

¶ 33    Respondent testified that she was frustrated because she did not begin services until October 2022 and felt that she started off behind and was treated unfairly by the agency. She explained that visitation was sometimes supervised by the agency, but at other times she was only able to visit the minors because the foster mother arranged and supervised the visits. Respondent stated that she requested additional visitation, but it was never arranged.

¶ 34    On cross-examination by the State, respondent acknowledged that the trial court had ordered her not to use marijuana while engaged in services. She admitted that she smoked marijuana two to three times per week at times, never obtained a medical marijuana card, and understood that missed drug drops would be considered positive but missed them due to poor planning. She also admitted using marijuana during her most recent pregnancy and continuing to use it sporadically.

¶ 35    Respondent acknowledged that she received referrals for individual therapy three times, a parenting class, parent coaching twice, a substance abuse assessment, and visitation. She admitted

- 13 -

that she was under the influence at her last parent coaching session with Williams but testified that this was not the only reason the sessions ended. She asserted that CASA discontinued the sessions because Williams was bringing her own children to the sessions and CASA thought that this was unprofessional. Respondent stated that she submitted to a drug drop a day or two after the last session and it was positive for THC. She never advanced to unsupervised visitation because she did not complete parent coaching. Respondent acknowledged that her visitation with the minors was inconsistent. She testified that, since May 2024, she had lived in a two-bedroom apartment with her youngest child. She worked two part-time jobs paid in cash, earning between $400 and $1,100 per week, but never provided proof of income.

¶ 36    Following argument, the trial court found that the State had proved all alleged grounds of unfitness. The court noted prior involvement between respondent and DCFS. In 2018, respondent left her children unattended in a car. In 2020, there were two incidents: one in which the minors were found in the street at night after respondent fell asleep and were nearly hit by a car, and, three weeks later, an incident in which respondent left the minors and their older sister home alone for approximately two hours; the children were outside and were picked up by police.

¶ 37    The trial court noted that in this case, on May 4, 2022, the minors accessed the roof of the two-story home and threw their pet rabbit off it while respondent was on the phone for two hours. Investigation reports indicated that the older sibling, L.B., stated that she assumed parental responsibilities, frequently cooking for the minors and taking them to school. There were also indications that the minors were largely non-verbal, not bathed, not completing homework, and did not have a normal sleep schedule. The court acknowledged that these reports were hearsay but considered them relevant only to highlight the need for respondent to make progress in services.

¶ 38    The trial court found that, while respondent participated in services, her efforts were never reasonable, and she made no substantial progress.  The court was particularly concerned with respondent's continued marijuana use.  Respondent missed numerous drug drops despite knowing that absences would be treated as positive tests, and the court found her explanations for missing drops not credible.  The court concluded that respondent used marijuana as a coping mechanism and did nothing on her own initiative to stop.

¶ 39    The trial court further found that, although respondent attended individual therapy and received some parent coaching, she did not make reasonable progress.  Even after successfully completing individual therapy in September 2023, concerns remained about her ability to maintain healthy relationships and make good decisions.  The court noted that respondent completed virtual parent coaching with Griffin, but found it insufficient because it did not involve the minors.  In-person parent coaching with Williams was delayed for a month due to respondent's recent childbirth.  At the first session, respondent primarily attended to the newborn while the minors engaged in activities on their own.  Respondent was unsuccessfully discharged from in-person parent coaching in January 2024 after the foster mother declined to host sessions due to respondent's substance use.  Parent coaching never resumed because the parties could not coordinate a mutually available time.

¶ 40    The trial court also found that visitation, which was initially consistent, began to decline after November 2023.  In early 2024, the agency assumed supervision of visits because respondent frequently failed to follow rules at the foster mother's home—arriving late, missing visits, or attending but prioritizing personal tasks such as doing laundry.  There was a two-month period with no visits.  The court concluded that this demonstrated a lack of reasonable interest, concern, or responsibility for the minors. Visitation never progressed to unsupervised because respondent

had not demonstrated an active ability to parent. Further, respondent lacked stable housing for most of the case, only obtaining it in May 2024. She claimed to work two jobs but never provided proof of income. The court found her testimony not credible and concluded that, despite many opportunities to make progress, respondent failed to do so and was unfit to parent the minors.

¶ 41 A best-interests hearing commenced the same day. The trial court took judicial notice of the exhibits and testimony from the unfitness hearing and admitted People's Exhibit 15, CASA's best-interests report. The report indicated that the minors had lived with the foster parents for almost three years. The foster parents had been family friends of respondent and involved in the minors' lives since their birth. The minors referred to the foster parents as "grandma" and "grandpa" and stated that they felt safe with them. The foster parents provided appropriate clothing, books, toys, and met all the minors' needs. The minors enjoyed cooking with the foster mother, and the home was well-maintained, clean, and comfortable. The foster parents were willing to allow contact with respondent as long as it was safe and appropriate. The minors attended church with the foster parents and participated in church events. Because the foster parents shared the same race as the minors, the children were able to learn about their culture. The minors were involved with the foster parents' extended family and were scheduled to serve as flower girls at an upcoming wedding. The minors had a strong attachment to the foster parents and their extended family and stated that they wanted to continue living in the foster home, which was the only home they remembered. They attended school and participated in extracurricular activities. CASA concluded that it was in the minors' best interests to terminate respondent's parental rights.

¶ 42 Coe testified that she had been employed by Guardian Angel Community Services as a foster care case manager since July 2023 and became the minors' caseworker in October 2024.

Within two weeks of her assignment, she visited the minors at the foster mother's home and subsequently observed them approximately once a month. Coe testified that the home was safe and appropriate, and all of the minors' needs were met. Their relationship with the foster mother was loving and nurturing, and they referred to her as "Granny." The minors adored their foster father. The children participated in basketball, summer camp, and other activities and field trips. They were involved with the foster mother's extended family and had recently served as flower girls at the wedding of the foster mother's sister. Although entering third grade, the minors were behind academically and had IEPs requiring extra tutoring. The foster mother actively assisted with reading and writing. Additionally, as a result of foster mother's intervention, the minors were diagnosed with attention deficit disorder and the foster mother ensured they took their daily medication. The foster parents were willing to provide permanency, and the minors expressed a desire to remain in the foster home. The foster parents would allow future contact with respondent if it was safe and appropriate.

¶ 43    Respondent testified that she was still living in the same apartment in Chicago with her infant daughter. She stated that if the minors returned home, they would have their own room. Respondent acknowledged that she had failed her children but maintained that her home with the minors was always full of love. She expressed gratitude for everything the foster mother had provided. Respondent believed it was still in the minors' best interests to have her as their mother, even if they remained in the foster mother's care. She argued that motherhood was a journey and that she should be allowed to continue that journey.

¶ 44    Following argument, the trial court rendered its ruling. The court found that it was in the minors' best interests to terminate respondent's parental rights. While acknowledging that respondent loved her children, the court emphasized that the minors had been in the foster parents'

care for three years and that the foster mother, a family friend, had been involved in the minors' lives since their birth. The court concluded that, to maintain stability, the minors needed to be available for adoption. The minors attended church with the foster family and shared the same race, allowing them to experience similar cultural opportunities. They were involved in the foster parents' extended family, attending gatherings, holidays, and other celebrations. CASA reported that the minors were eager to remain in the foster home, which they stated was the only home they remembered. In the foster home, the minors were making academic and behavioral progress, with the foster parents providing tutoring and additional schoolwork support. The court found that, although respondent loved the minors, she did not have a strong bond with them. The trial court concluded that, by a preponderance of the evidence, it was in the minors' best interests to terminate respondent's parental rights. Respondent then filed a timely notice of appeal.

¶ 45                                  II. ANALYSIS

¶ 46     Respondent filed her notice of appeal on July 16, 2025. Under Illinois Supreme Court Rule 311(a)(5), our disposition is to be filed within 150 days of that date, or by December 15, 2025, unless good cause is shown why that date should be extended. Ill. S. Ct. R. 311(a)(5) (eff. Apr. 3, 2018). Here, respondent filed a motion for extension of time and two later motions for leave to file her opening brief instanter. In light of respondent's *pro se* status, this court granted those motions. As a result of these extensions and the attendant delay, full briefing was not completed until December 15, 2025. Accordingly, we find good cause to issue our decision after the 150-day deadline.

¶ 47     On appeal, respondent, proceeding *pro se*, argues that: (1) the trial court's fitness finding was against the manifest weight of the evidence because the State relied on insufficient, contradictory, and unreliable testimony; (2) the court erred in relying on subjective assertions by

CASA and the foster parents that were not based on firsthand knowledge or observations; (3) the court failed to consider agency-caused delays and deficiencies in services; (4) she was denied due process; and (5) the trial court's best interests determination was against the manifest weight of the evidence.

¶ 48    We first address the State's argument that respondent's statement of facts should be stricken and her arguments deemed forfeited for failure to comply with Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020).  Rule 341(h) governs the contents and requirements of an appellant's brief. Rule 341(h)(6) provides that the statement of facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal."  Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020).  Rule 341(h)(7) further provides that the argument section "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."  Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).  Rule 341(h) is not a mere suggestion, and this court has discretion to strike a noncompliant brief and dismiss the appeal.  *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999).

¶ 49    Upon review of respondent's brief, we conclude that her statement of facts is deficient, contains argument and commentary, and includes few citations to the record.  The argument section likewise largely fails to include citations to the record.  In addition, several authorities cited by respondent do not support the propositions for which they are offered.  For example, respondent relies on *In re A.P.*, 2012 IL 113875, for the propositions that "when the record affirmatively demonstrates progress, compliance, and agency-created barriers rather than parental unwillingness, the manifest weight standard requires reversal" and that an "unfitness finding cannot be grounded in conjecture, hearsay, or subjective impressions."  However, *A.P.* reversed a

finding of neglect where a child was injured while in the care of a third party and there was no evidence that the parents knew or should have known that the third party was not suitable to provide a safe and nurturing shelter for the child. *Id.* ¶ 26. The case did not address parental progress or compliance with service plans and did not involve a finding of unfitness.

¶ 50 Further, respondent cites a case, *In re K.B.*, 2019 IL App (3d) 180086, which does not exist. The citation is therefore erroneous, which could be due to a transcription error (see, *e.g.*, *In re K.B.*, 2019 IL App (4th) 190496) or reliance on an artificial intelligence (AI) research tool. Although the use of AI is not prohibited, litigants remain responsible for ensuring the accuracy of their filings. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 131. Citation to a nonexistent authority is grounds for striking a brief and dismissing an appeal. *Pletcher v. Village of Libertyville Police Pension Board*, 2025 IL App (2d) 240416-U, ¶ 29. Despite respondent's failure to comply with Rule 341(h) and her erroneous citations, we will address her arguments on the merits because a biological parent's right to raise his or her child is a fundamental liberty interest, and the involuntary termination of parental rights is a drastic measure (*In re Gwynne P.*, 215 Ill. 2d 340, 353 (2005)). *In re C.R.*, 2024 IL App (4th) 231441-U, ¶ 20 (addressing termination on the merits despite briefing failures).

¶ 51 The Juvenile Court Act of 1987 (Act) sets forth a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/1-1 *et seq.* (West 2024)). Initially, the State must establish, by clear and convincing evidence, that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). See 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then prove, by a preponderance of the evidence, that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d

347, 367 (2004). We will not disturb a trial court's finding as to fitness or best interests unless it is against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 52    Respondent's first contention is that the trial court's fitness finding was against the manifest weight of the evidence. Rather than addressing each specific ground, respondent argues generally that the court erred because she completed multiple services, including a parenting class, individual therapy, and visitation-related requirements. Here, the trial court found respondent unfit on five different grounds. A finding of unfitness may be affirmed on any single ground, and we need not consider the remaining grounds if one is supported by the record. *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004). We affirm the trial court's fitness determination on the basis that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the minors.

¶ 53    In addressing a finding of unfitness based on a failure to maintain a reasonable degree of interest, concern or responsibility for the minor (750 ILCS 50/1(D)(b) (West 2024)), the court must examine the parent's conduct "in the context of the circumstances in which that conduct occurred." *In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990). The focus under this ground is on the reasonableness of the parent's efforts, not their ultimate success. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). The court must also consider any circumstances that made it difficult for the parent to visit, communicate with, or otherwise demonstrate interest in the child. *Id.* Noncompliance with a service plan is relevant to this inquiry. *Id.* "[A] parent need not be at fault to be unfit, and she is not fit merely because she had demonstrated some interest in or affection for her child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Because the trial court is in the

best position to observe the demeanor and conduct of the parties and witnesses, it is best situated to assess credibility and weigh the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). Accordingly, the trial court is afforded broad discretion and great deference in matters involving minors. *Id.*

¶ 54    Although respondent completed certain services, including a parenting class, individual therapy, and virtual parent coaching, the trial court's finding of unfitness was not against the manifest weight of the evidence. The court correctly noted heightened concern in this case due to respondent's prior history with DCFS. The record shows that respondent had three prior indicated findings with DCFS regarding failure to properly supervise the minors. She had been offered intact family services and pled guilty to child endangerment. Nonetheless, in the incident giving rise to the present case, the minors were found on the roof of the home and had thrown their pet rabbit from it while respondent was on the telephone.

¶ 55    The trial court also correctly found that respondent failed to make reasonable progress in her recommended services. Respondent was unsuccessfully discharged from individual therapy for nonattendance and required re-referral. Although she later successfully completed an initial round of individual therapy, the court ordered her to resume therapy because concerns remained regarding her lack of participation with the minors, instability, and failure to make herself available to the agency. Respondent was also unsuccessfully discharged from in-person parent coaching after appearing withdrawn at the final session and raising concerns about substance use. She stated that she had taken Benadryl but failed to complete a requested drug drop until several days later, and therefore could not prove that she was not under the influence of THC or another substance.

¶ 56    Respondent's services required her to refrain from marijuana use, but she continued to use it. Of 29 scheduled drug screens, she missed 14 and tested positive 11 times. She admitted

smoking marijuana two to three times per week. Her continued use ultimately impacted her services, as the foster mother discontinued hosting in-home parent coaching after respondent appeared under the influence at the final session. Although respondent attributed the failure to resume parent coaching to her caseworker and Williams, it was her own conduct that necessitated relocating the service and limiting it to weekdays, which created the scheduling difficulties.

¶ 57    Respondent also failed to make reasonable progress with visitation. Her visitation decreased after the birth of her baby in October 2023. The foster mother reported that respondent was inconsistent, often arriving late or missing visits entirely. When the agency took over supervision, respondent attended only about half the scheduled visits. Both the foster mother and the agency reported that, during visits, respondent frequently refused to help the minors with homework or provide activities. There was also a two-month period during which no visitation occurred. Respondent did not attend the minors' birthday party in June 2024 and arrived at a tea party scheduled with the minors after it had concluded. Because respondent did not complete parent coaching, visits never progressed to unsupervised or overnight visits.

¶ 58    Additionally, respondent failed to demonstrate an ability to maintain stable housing or employment. Although the minors had been in foster care since May 2022, respondent did not obtain her own apartment until approximately two years later. Prior to that, she resided with various individuals or in a maternity shelter. While she claimed to work two jobs and receive cash payment, she provided no proof of income and did not regularly contribute financial support toward the minors' care during the nearly three years they resided with the foster parents. Based on the foregoing, we cannot say the trial court's finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the minors was unreasonable, arbitrary, or not based on the evidence, or that the opposite conclusion was clearly evident.

¶ 59 Respondent raises several arguments challenging the reliability and credibility of the evidence. For example, she contends that CASA's testimony was "confused, speculative, and not based on firsthand observations," and that the foster parent's assertions were "subjective, unverified, and contradicted by DCFS investigators." However, it is well settled that "[w]here the evidence is in conflict, we defer to the trial court's disposition regarding factual findings and credibility assessments, because the trial court is in the best position to make these determinations." *In re S.T.*, 2021 IL App (5th) 210077, ¶ 68; *In re Natalia O.*, 2019 IL App (2d) 181014, ¶ 56 (conflicts in the evidence are for the trial court to resolve). Moreover, neither CASA nor the foster parent testified at the fitness hearing; any references to their statements were contained in exhibits that were admitted without objection.

¶ 60 Respondent further argues that the trial court improperly relied on hearsay statements attributed to the minors' older sister, L.B., suggesting she acted in a mother's role for the minors. The record, however, reflects that the trial court expressly stated that it was not considering those statements for the truth of the matter asserted. Rather, the court referenced them in the context of emphasizing the need for respondent to demonstrate progress in services and her ability to care for the minors—an obligation that existed independent of any statements by L.B. Although respondent characterizes those statements as a "central pillar" of the court's reasoning, the record does not support that assertion.

¶ 61 Respondent next argues that the trial court failed to consider agency-caused delays and service deficiencies. The record, however, reflects that the trial court was well aware of the agency delays and service failures, which is why it declined on two occasions to change the permanency goal to substitute care. In March 2024, the court stated that it wanted to change the goal but maintained it at return home because the agency had not made reasonable efforts. In June 2024,

the court changed the goal to guardianship, allowing respondent additional time to make progress with her service plans. It was not until December 2024 that the trial court found the agency had made reasonable efforts and changed the goal to substitute care pending a determination on termination of parental rights.

¶ 62    Moreover, apart from the minors being taken into care in May 2022 and the initial services not beginning until October 2022, the remaining delays were at least partially attributable to respondent. She missed appointments, which led to her discharge from individual therapy and required a new referral. The foster mother discontinued hosting in-home parent coaching after respondent appeared under the influence at the final session. This necessitated a new referral and relocation of the service from weekend sessions at the foster home to weekday sessions elsewhere, which created scheduling conflicts. Further, at the unfitness hearing, respondent acknowledged receiving multiple referrals, including three for individual counseling, two for parenting coaching, a parenting class, a substance abuse assessment, and visitation. Accordingly, respondent's claim that her service failures were solely attributable to DCFS, and therefore insufficient to support a finding of unfitness, is not supported by the record.

¶ 63    Respondent next contends that she was denied due process because critical hearings were held and orders entered without proof of notice or service upon her. She notes, for example, that the record contains no affidavit of service, certified mailing, or sheriff's return related to the June 2022 removal hearing or the September 2023 permanency review hearing. She also raises arguments on behalf of the putative father, Darryl R., alleging that he was also denied due process.

¶ 64    Parents have a fundamental liberty interest in the care, custody, and control of their children. *In re M.H.*, 196 Ill. 2d 356, 362-63 (2001). Accordingly, due process requires that a parent have adequate notice in juvenile proceedings. *In re A.M.*, 402 Ill. App. 3d 720, 724 (2010).

The Juvenile Court Act further sets forth a respondent's right to be present at proceedings. 705 ILCS 405/1-5 (West 2024). Further, section 2-15(7) of the Act provides:

> "The appearance of the minor's legal guardian or custodian, or a person named as a respondent in a petition, in any proceeding under this Act shall constitute a waiver of service of summons and submission to the jurisdiction of the court, ***." *Id.* § 2-15(7).

¶ 65    In the present case, respondent appeared not only at the June 2022 removal hearing and the September 2023 permanency hearing, but also at every other hearing in this case. Her presence not only satisfied her due process right to be present at the proceedings, but also waived any notice requirements. *In re A.M.*, 402 Ill. App. 3d at 724. Further, respondent lacks standing to assert alleged due process violations on behalf of the putative father. "For a party to have standing, the party must suffer some injury in fact to a legally cognizable interest and must have sustained, or be in immediate danger of sustaining, a direct injury as a result of the complained-of conduct." *Department of Transportation v. Anderson*, 384 Ill. App. 3d 309, 313-14 (2008). We therefore reject her due process arguments.

¶ 66    Finally, respondent challenges the trial court's finding that termination of her parental rights was in the minors' best interests. As noted, once a parent is found unfit, the court must determine whether termination serves the child's best interests. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 41. The best interests of the child are paramount and take precedence over all other considerations. *In re I.H.*, 238 Ill. 2d 430, 445 (2010). A child's best interests are not to be balanced against any other interest; they must remain inviolate. *In re Austin W.*, 214 Ill. 2d 31, 49 (2005). Even the superior rights of a natural parent must yield if consistent with the child's best interests. *Id.* at 50. Accordingly, at the best interests phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*,

212 Ill. 2d at 364. The State bears the burden of proving by a preponderance of the evidence that termination is in the child's best interests. *Id.* at 366.

¶ 67    The Juvenile Court Act enumerates factors for assessing a child's best interests, which must be considered in the context of the child's age and developmental needs. These factors include: (1) the minor's physical safety and welfare; (2) the development of the minor's identity; (3) familial, cultural, and religious background; (4) sense of attachment, including love, security, familiarity, and continuity of relationships with parental figures; (5) the minor's wishes and goals; (6) community ties; (7) the minor's need for permanence; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2024). The trial court need not explicitly reference every factor in rendering its decision. *Jaron Z.*, 348 Ill. App. 3d at 262-63. We review the trial court's best interests finding under the manifest-weight-of-the-evidence standard. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 41.

¶ 68    Here, the record supports the trial court's best interests finding. At the time of termination, the minors were nine years old, had lived with the foster parents for over three years, and needed permanence. The minors expressed a desire to remain with the foster parents, reported feeling safe there, and identified it as the only home they truly remembered. Evidence showed that the minors were well cared for, with all their needs met. They were the same race as the foster parents, had become part of the foster family and extended family, and attended church with them. Academically, the minors made progress, attended school regularly, received help from the foster parents with schoolwork, participated in extracurricular activities, and received professional tutoring. The foster mother advocated for attention deficit diagnoses and ensured the minors took their medication. While respondent clearly loves the minors, the evidence demonstrated that she

- 27 -

never proved an ability to care for them independently. She never advanced to unsupervised visitation and did not maintain stable housing until one month before the termination hearing. Given the record and the deference afforded to the trial court, we cannot say its finding that termination was in the minors' best interests was against the manifest weight of the evidence.

¶ 69                                    III. CONCLUSION

¶ 70    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 71    Affirmed.